IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

SPECTRUM LIGHTING & CONTROLS, INC.,

                              Plaintiff,

v.                                                    Civil Action No. 2:18-cv-2253-TLP-cgc
                                                      JURY DEMANDED
SESCO LIGHTING, INC., and
THE WATT STOPPER, INC.,

                              Defendants.

## AMENDED COMPLAINT

COMES NOW Plaintiff, Spectrum Lighting & Controls, Inc., ("Plaintiff" or "Spectrum") and files this Amended Complaint, pursuant to FED. R. CIV. P. 15(a)(1)(B), against Defendants SESCO Lighting, Inc. ("SESCO"), and The Watt Stopper, Inc. ("Watt Stopper") (collectively "Defendants"), and would show and state unto the Court as follows:

### INTRODUCTORY STATEMENT

This is a case of unlawful competition through breach of contract, defamation, tortious and intentional interference with business relations, tortious and intentional interference with contract and the conspiracy to commit these torts and statutory violations. Plaintiff is a significant participant in the Mid-South commercial lighting market and is a competitor of Defendant SESCO. Defendant SESCO, which holds itself out as the largest and most successful lighting manufacturer's representative in the United States, conspired with Defendant Watt Stopper, one of the nation's largest lighting controls manufacturers, who at the time was contracted to Spectrum as its exclusive representative in the Mid-South market, to enter the Mid-South market by

intentionally, recklessly, or negligently spreading false rumors, misrepresentations, and misleading representations to Plaintiff's customers, employees, manufacturers and contractors that Plaintiff was selling to SESCO; going out of business; its President was ill, dying or retiring from Plaintiff within 30 to 60 days; and, its key employees were resigning to join SESCO.  Defendants conspired to defame Plaintiff to its customers, employees, manufacturers, contractors and other business partners.  Defendants SESCO and Watt Stopper had been specifically informed by Plaintiff that it was not interested in selling.  Nevertheless, Defendants continued to publish and spread false and defamatory statements and misleading rumors regarding Plaintiff's business in order to injure Plaintiff's reputation and business opportunities in the Mid-South commercial lighting market.  Defendants SESCO and Watt Stopper conspired to intentionally interfere with Plaintiff's relationships and contracts with its customers, employees, manufacturers, contractors and other business partners.  Defendants made these false statements, misrepresentations, and misleading representations with the predominant purpose of breaching those relationships and caused injuries to Plaintiff's business in the Mid-South commercial lighting market.  Moreover, through its actions as set forth herein, Defendant Watt Stopper breached its exclusive representation agreement with Spectrum.

## PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Spectrum Lighting & Controls, Inc. is a corporation organized and existing under the laws of the State of Tennessee that maintains its principal place of business at 1375 West Brierbrook, Germantown, Tennessee 38138.

2.     Defendant SESCO Lighting, Inc. is a Florida corporation whose principal place of business is located at 222 W. Maitland Boulevard, Maitland, Florida 32751.  SESCO Lighting,

Inc. is authorized to do business in the State of Tennessee and may be served with process upon its registered agent Robert Arras, 4543 Trousdale Drive, Nashville, Tennessee 37204.

3.      Defendant The Watt Stopper, Inc. is a California corporation whose principal place of business is located 2700 Zanker Road, Suite 168, San Jose, California 95134.  Watt Stopper is authorized to do business in the State of Tennessee and may be served with process upon its registered agent CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919-5546.

4.      This Court has subject matter jurisdiction based on diversity of citizenship pursuant to 28 U.S.C. § 1332 since Plaintiff and all Defendants are citizens of different states, and the amount in controversy is in excess of $75,000, exclusive of costs and interest, as to each claim and each Defendant.

5.      Further, all Defendants are subject to personal jurisdiction since Defendants are registered and are doing business in the State of Tennessee, and/or Defendants have had sufficient minimum contacts with the State of Tennessee with respect to the actions and events that give rise to this cause of action, and/or Defendants have had continuous, substantial and systematic contacts with the State of Tennessee to give rise to personal jurisdiction in the State of Tennessee.

6.      Venue for this action properly lies in the United States District Court for the Western District of Tennessee under 28 U.S.C. 1391 as Defendants are registered and authorized to do business in Tennessee and most of the actions and a substantial part of the conduct giving rise to this lawsuit occurred in Shelby County, Tennessee, which is within this judicial district.

## **FACTUAL BACKGROUND**

7.      Spectrum is a Mid-South representative for over 80 lighting and lighting controls manufacturers.  Spectrum has been in business for fifteen years.  It provides custom lighting design

and products to wholesalers, contractors and designers throughout the Mid-South, with the majority of its business conducted in Tennessee, Arkansas, and Mississippi.

8.      Defendant Watt Stopper is a lighting controls manufacturer that was under contract with Spectrum to be exclusively represented by Spectrum at all operative times until it breached its exclusive contract with Spectrum and was thereafter terminated by Spectrum as set forth herein. Spectrum terminated Defendant Watt Stopper because Spectrum learned that Defendant Watt Stopper conspired and intentionally acted in concert with Defendant SESCO to hire away Spectrum's employees and to harm Spectrum's business and/or run Spectrum out of business so that Defendant SESCO could enter the market in a position of strength, at which time Watt Stopper would terminate its contract with Spectrum and execute a contract to be SESCO's lighting controls products provider.

9.      Defendant SESCO holds itself out on its website as "the nation's largest and most successful lighting manufacturer's representative."  Prior to March 2018, Defendant SESCO had virtually no presence in the Mid-South market.  Defendant SESCO is a direct competitor of Spectrum.

10.     Defendant SESCO and Defendant Watt Stopper have a relationship in the lighting and lighting controls market on a national level.  In fact, SESCO and Watt Stopper have combined and partnered in every single geographic market in the United States where SESCO does business. Defendant Watt Stopper and Defendant SESCO conspired to harm Spectrum's reputation and business opportunities and/or eliminate Spectrum from the Mid-South market.  The conspiracy started at a time when Defendant Watt Stopper was exclusively contracted to Spectrum as a lighting controls products provider.  Defendants SESCO and Watt Stopper have engaged in the same or similar conduct in other geographical United States markets affecting the lighting and

4

lighting controls business there.  Defendants SESCO and Watt Stopper engaged in this conduct so that Defendant SESCO could gain entry in the Mid-South lighting market, at which time SESCO would contract with Defendant Watt Stopper, resulting in benefits for each company.

11.     In December 2017, Defendant Watt Stopper and Defendant SESCO conspired to hire away Spectrum's key employees and steal Spectrum's business.  Doug Fitzpatrick of Watt Stopper contacted Mr. Bradley Eison ("Mr. Eison"), who at the time was employed by Spectrum as its Contractor Sales and Controls Manager.  Mr. Fitzpatrick advised Mr. Eison that Spectrum was coming into the Mid-South market and asked Mr. Eison if he would agree to go work for SESCO.  This initial contact occurred in mid-December 2017, at a time when Mr. Fitzpatrick made a trip to Spectrum along with trainee Loren Mitchell.  At such time, Watt Stopper was contracted to Spectrum for Spectrum to be its exclusive representative in the Mid-South market.  In follow-up to this solicitation, Bryan Pike, the Regional Vice President of Sales for Building Controls Systems for Defendant Watt Stopper's parent company, Legrand, North America introduced Mr. Eison to SESCO's Vice President, Tom Salter on January 5, 2018, via email and requested that Mr. Eison set up a meeting with Mr. Salter because SESCO was about to enter the Mid-South market.  Mr. Pike's email provides that: "Tom is a great guy and we have a great relationship with SESCO in our market."  It was a breach of Spectrum's exclusive representation agreement with Watt Stopper for Watt Stopper to secretly introduce Spectrum's employees to SESCO, a direct competitor of Spectrum, so that SESCO could enter the Mid-South market.  This conduct occurred while Spectrum was contracted to represent Watt Stopper in the Mid-South and was directly contrary to Spectrum's exclusive representation of Watt Stopper.  Mr. Salter then contacted Mr. Eison and requested a meeting to "talk."  Mr. Eison replied, "not at this time."  Mr. Salter contacted Eison again and stated that he thought Mr. Eison was part of the "succession plan" at Spectrum

and that he wanted to discuss "synergies."  Defendant SESCO and Defendant Watt Stopper contacted Mr. Eison of Spectrum and inquired as to whether Spectrum would be interested in selling to or partnering with Defendant SESCO.  Defendants Watt Stopper and SESCO inquired as to "who" at Spectrum Defendant SESCO should communicate with concerning a potential purchase.  During this time period, Mr. Fitzpatrick of Watt Stopper exerted pressure on Mr. Eison to talk with SESCO about going to work there.  Watt Stopper also urged Mr. Eison that Chase Tinnin, another Spectrum key employee, should be included in a plan to leave and commence a relationship with SESCO.  Watt Stopper threatened that SESCO was coming to the Mid-South and that, when that happened, SESCO would be the new Watt Stopper exclusive representative—end of story.  Mr. Fitzgerald of Watt Stopper informed Mr. Eison that maybe he could get SESCO to agree not to come into the market for one (1) year **if** Mr. Eison could acquire Spectrum immediately and agree to sell to SESCO within one (1) year.   Mr. Fitzgerald harassed Spectrum's key employees, including Mr. Eison and Mr. Tinnin, by sending repeated emails and texts asking them: "Why won't you meet with SESCO?"  Defendants SESCO and Watt Stopper, acting in concert, engaged in discussions for Mr. Eison and Mr. Tinnin to obtain employment with Defendant SESCO, a direct competitor of Spectrum, and to elicit them to help Defendants eliminate Spectrum from the Mid-South market, or, at a minimum, take business away from Spectrum.  Defendants SESCO and Watt Stopper were aware that Mr. Eison and Mr. Tinnin were subject to confidentiality and restrictive covenant agreements with Spectrum at the time Defendants SESCO and Watt Stopper began soliciting them.

12.     Mr. Eison advised Spectrum's shareholders that Defendant SESCO was planning to enter the Mid-South market with the support of Defendant Watt Stopper and had inquired whether Spectrum was interested in selling to Defendant SESCO.  Plaintiff's shareholders said

they were not interested in selling to Defendant SESCO.  On January 15, 2018, Mr. Eison informed Defendants SESCO and Watt Stopper that Plaintiff's shareholders were not interested in selling to Defendant SESCO.  On January 17, 2018, Mike Earps, President of Spectrum, sent an email to Defendant SESCO confirming that Spectrum was not interested in selling to Defendant SESCO.

13.     Around the same time, and after they had learned that Mr. Earps was not interested in selling Spectrum to SESCO, Defendants SESCO and Watt Stopper represented to Mr. Eison that if he and his wife, Ms. Emory Eison ("Ms. Eison"), could obtain ownership of Spectrum within the next year, then Defendant SESCO would stay out of the Mid-South market until Mr. Eison and Ms. Eison became the owners of Spectrum, at which point Defendant SESCO would buy Spectrum and retain a relationship with Defendant Watt Stopper as its lighting controls provider.  This is the same plan that had been suggested previously by Mr. Fitzgerald of Watt Stopper.

14.     Despite express knowledge that Spectrum was not selling to SESCO, Defendants Watt Stopper and SESCO developed a plan to defame Spectrum and interfere in Spectrum's contractual and business relations by making statements to third parties that would lead the third parties to believe that Spectrum would be selling-out to SESCO or going out of business, and that Mr. Earps was suffering from an illness and would close down Spectrum and/or that he would retire in 30 to 60 days.

15.     Defendants Watt Stopper and SESCO continued to contact Mr. Eison concerning a "purchase" of Spectrum by Defendant SESCO when they knew that Spectrum was not for sale and that Mr. Earps did not want to sell to SESCO.  At this time, Defendant Watt Stopper was still under contract with Spectrum to provide lighting controls as its exclusive representative, yet it was actively conspiring with Defendant SESCO to intentionally interfere in Spectrum's various business and contractual relationships for the benefit of Defendant SESCO and itself.

16.     In response to Defendant Watt Stopper's actions that were against Spectrum's best interests and in violation of their exclusive agreement, Spectrum considered alternatives for lighting controls other than Defendant Watt Stopper.  Defendant Watt Stopper had made it clear that, once Defendant SESCO entered the Mid-South market, Defendant Watt Stopper would terminate its contract with Spectrum in favor of Defendant SESCO, a competitor of Spectrum with whom Defendant Watt Stopper has a national relationship.  Mr. Eison suggested that Spectrum fire Watt Stopper and obtain a long-term contract with Crestron (controls).  Spectrum entered into a long-term contract with Crestron.  On March 14, 2018, Spectrum terminated its contract with Watt Stopper due to Watt Stopper's breach of the exclusive representation contract as referenced herein.  Defendant Watt Stopper was planning to terminate its contract with Spectrum in any event in favor of Defendant SESCO, once Defendant SESCO entered the Mid-South market.

17.     Defendants then commenced a smear campaign against Spectrum by making false statements, misrepresentations, and misleading representations regarding Spectrum's viability.  These statements were made intentionally, recklessly, and/or negligently, and the statements, and the implication of the statements, had the power to injure Spectrum's reputation and business opportunities.  On March 20-22, 2018, Defendants Watt Stopper and SESCO representatives made calls upon numerous Spectrum customers in the Mid-South, many of whom were under contract with Spectrum and who Defendants knew were under contract with Spectrum, where they represented and/or implied that Spectrum's President, Mr. Earps, was sick, dying or retiring and that Defendant SESCO was buying Spectrum or, if Spectrum would not sell, SESCO would be putting Spectrum out of business.  Various Spectrum customers reported to Spectrum that Defendants SESCO and Watt Stopper were also advising them that Mr. Earps would be retiring in 30-60 days.  Defendant SESCO also stated that Spectrum's key employees were coming to work

for Defendant SESCO.  These statements were made by Defendant SESCO's Branch Manager Robert Arras, and by Mr. Pike and Mr. Fitzgerald of Defendant Watt Stopper to various Spectrum customers.  Additionally, in furtherance of their conspiracy, Defendants SESCO and Watt Stopper confirmed and ratified each other's statements to the various Spectrum customers.  The statements regarding Mr. Earps's continued employment and whether Spectrum was selling or going out of business were false and defamatory.  The remaining statements implied that Spectrum was going out of business, which was also false and defamatory.

18.    For example, on March 20, 2018, beginning at 11:30 a.m. central time, Mr. Arras of Defendant SESCO, and Mr. Fitzpatrick and Mr. Pike of Defendant Watt Stopper, met with representatives of Spectrum's customer Electri-com, Eric Parker and Kelly Sisk.  Mr. Arras made the following defamatory statements during the discussion: "We are buying Spectrum."  "Mike Earps is retiring in 30 to 60 days." These statements were false and were made by the Defendants in order to lead the customers to question Spectrum's viability, which constituted a serious threat to Spectrum's business opportunities and reputation.  In addition to these false statements, Mr. Arras made other statements that, although they might be considered "puffery" or technically true, when spoken in conjunction with each other and with the false statements implied that Spectrum would be going out of business, which constituted a serious threat to Spectrum's business opportunities and reputation: "We will either buy out Spectrum or take their business and employees."  "We are taking Spectrum out of the Mid-South lighting market."  "We are the largest lighting manufacturers' representative in the country, and we get what we want."  "We are actively negotiating with Spectrum's key employees Bradley Eison and Chase Tinnin to come on board with SESCO."  At the time of the meeting, Electri-com was a large customer of Spectrum, had several purchase orders with Spectrum, and had ongoing projects in the Mid-South with Spectrum.

When asked where Mr. Arras had heard these "facts," Mr. Arras responded, "We have a very good source at Spectrum." Defendant Watt Stopper representatives Mr. Fitzpatrick and Mr. Pike made similar statements and confirmed everything that Mr. Arras said. Mr. Arras said they would be visiting other Spectrum customers, including IAC (Memphis), CED (Memphis), and CED (Tupelo) in the next few days for the purpose of soliciting these customers away from Spectrum. Electri-com was shocked. Within hours, Mr. Parker began receiving calls from other Mid-South lighting businesses asking if he had heard that Spectrum was selling to Defendant SESCO and that Mr. Earps was sick and retiring.

19.     On March 21, 2018, these same representatives of Defendants SESCO and Watt Stopper met with Michael Shotts of CED, another large Spectrum customer. Mr. Arras informed CED that they were in talks with Spectrum to purchase them. Watt Stopper's representatives made no attempt to point out the falsity of this statement, which they knew to be untrue.

20.     On March 22, 2018, these same representatives of Defendants SESCO and Watt Stopper solicited Spectrum's customer CED (Tupelo). They met with Roddy Broadaway of CED in Tupelo.

21.     On March 21, 2018, these same representatives met with Spectrum's customer IAC and solicited IAC's business. They met with Darrell Smith, Phil Everitt and Steve Delk.

22.     Spectrum and its customers began receiving calls from customers, employees, contractors, suppliers and manufacturers seeking verification concerning these statements by Defendants SESCO and Watt Stopper that Mr. Earps was "sick" and "retiring in 30-60 days," and that Spectrum was going out of business or selling to Defendant SESCO. A. B. Haynes of Pyramid Electric contacted Mr. Parker at Electri-Com because he had been told that Mr. Earps was selling and retiring. Rick Griffin of C.L Griffin contacted Mr. Earps after he was informed that Spectrum

was selling out to Defendant SESCO.  Mr. Earps was told that Bill Sproul at Sammarco Electric contacted Johnathan Buchanan at IAC, Spectrum's customer, and asked if Mr. Earps was dying. Josh Davis at American Electric said that he had heard that Bradley Eison and Mr. Earps went to dinner with Defendant SESCO and that during the dinner, Mr. Earps became so angry he got up and threw his food, leaving Mr. Eison alone with Defendant SESCO.  At the time, Mr. Earps was suffering from kidney stones, but the implication from the Defendants' statements was that Mr. Earps had an illness that could kill him (and thus possibly shut down Spectrum) as was evident from the customers' concerns that Mr. Earps was "dying."  The remaining statements and rumors concerning Spectrum and Mr. Earps were false.

23.     Spectrum was besieged by customer concerns that it was supposedly selling or going out of business.  On March 23, 2018, Spectrum prepared a mass email to send to all its customers advising that Spectrum was not going out of business in order to address the false and defamatory statements that originated with Defendant SESCO and its agent Robert Arras and Defendant Watt Stopper and its agents Doug Fitzgerald and Bryan Pike.  A copy of the email is attached hereto as Exhibit A.  The email was sent to nearly 700 Spectrum customers.

24.     The aforementioned email was sent in an effort to mitigate the damages to Spectrum's reputation and business relationships caused by the false statements and misrepresentations, but the email did not put an end to the rumors and questions about Spectrum's viability in the Mid-South lighting market nor did it keep Spectrum from losing employees and business opportunities.

25.     On April 13, 2018, Mr. Fitzgerald of Watt Stopper made a job offer to Spectrum's employee Mr. Tinnin for Mr. Tinnin to become employed by SESCO.  Mr. Fitzgerald told Mr. Tinnin that: "SESCO will pay you whatever you want if you will come work for them."  Mr. Tinnin

declined the job offer extended by Watt Stopper on behalf of SESCO.  Then, Mr. Fitzgerald commenced to make similar job offers by Watt Stopper, for employees of various customers of Spectrum to become employed by SESCO, all in an effort to harm Spectrum and its business in the Mid-South market and in an effort to benefit itself and SESCO in the Mid-South market.

## COUNT ONE

### TORTIOUS AND INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS AND PROSPECTIVE BUSINESS RELATIONS

26.     Spectrum re-alleges and incorporates as if fully set forth herein, the allegations of paragraphs 1 through 25.

27.     At all times, Spectrum had legitimate business relationships with its current and prospective customers, manufacturers, suppliers, contractors, and with its own employees. Defendants had knowledge of these business relationships as demonstrated by the statements, directed against Spectrum, made to the various individuals involved in these relationships.

28.     By engaging in tortious and intentional acts as set forth herein with the predominant purpose of injuring Spectrum by breaching or terminating Spectrum's relationships with current customers and prospective customers, Defendants, without justification or excuse, have unlawfully, intentionally, and tortiously interfered with Spectrum's business relations and prospective business relations with its employees, vendors, manufacturers, contractors and current and prospective customers.  Further, Defendants tortiously and intentionally interfered with Spectrum's business relations with its customers, contractors, manufacturers and its own employees through the improper means of communicating defamatory statements and misrepresentations or misleading representations about Spectrum's viability, by telling employees and customers that its owners were sick and/or would be retiring in 30-60 days and by communicating that Spectrum would be closing its facility, going out of business, and/or was being

acquired by another company (SESCO), all with the predominant purpose of persuading the employees to terminate their employment with Spectrum and causing Spectrum's customers and manufacturers to discontinue or diminish their business with Spectrum. Three Spectrum employees did in fact resign, causing loss to Plaintiff's business. The defamatory statements, false rumors and misrepresentations created a panic among Spectrum's manufacturers, customers, employees and contractors and in the Mid-South commercial lighting market, and caused Spectrum to lose business opportunities.

29.     Spectrum has suffered damages and financial injury by Defendants' tortious and intentional interference with its business relations and prospective business relations with its employees, vendors, suppliers, contractors, and current and prospective customers, in an amount which will be proven at trial. Defendants' actions have proximately caused a breach of business relations between Spectrum and its employees, vendors, suppliers, contractors, and current and prospective customers.

30.     Defendants have acted intentionally, maliciously, willfully and in bad faith with intent to harm Spectrum, or with a conscious indifference to the consequences of their actions and Spectrum is entitled to temporary, and permanent injunctive relief, as well as compensatory damages and punitive damages.

<u>**COUNT TWO**</u>

<u>**TORTIOUS AND INTENTIONAL INTERFERENCE WITH CONTRACT**</u>

31.     Spectrum re-alleges and incorporates as if fully set forth herein, the allegations of paragraphs 1 through 30.

32.     At all relevant times, Spectrum had contracts with many of its customers, manufacturers, suppliers, contractors, and with its own employees. Defendants had knowledge of

these contracts and had a duty under Tennessee law to determine whether their conduct and actions would cause the breach of the terms of the contracts.

33.     By engaging in tortious and intentional acts as set forth herein with the predominant purpose of injuring Spectrum by breaching or terminating Spectrum's contracts with customers, Defendants, without justification or excuse, have unlawfully, intentionally, maliciously, and tortiously interfered with Spectrum's contracts with its employees, vendors, manufacturers, contractors and customers.   Defendant SESCO tortiously and intentionally interfered in Spectrum's contract with Defendant Watt Stopper. As a result of the tortious and malicious actions of Defendant SESCO, Watt Stopper breached its contract with Spectrum for Spectrum to be its representative in the Mid-South market at a time when Watt Stopper was under exclusive contract to be represented by Spectrum.   Further, Defendants tortiously and intentionally interfered with Spectrum's contracts with its customers, contractors, manufacturers and its own employees through the improper means of communicating defamatory statements and misrepresentations or misleading representations about Spectrum's viability, by telling employees and customers that its owners were sick and/or would be retiring in 30-60 days and by communicating that Spectrum would be closing its facility, going out of business, and/or was being acquired by another company (SESCO), all with the predominant purpose of persuading the employees to terminate their employment with Spectrum and causing Spectrum's customers and manufacturers to discontinue or diminish their business with Spectrum and breach their contracts.   Three Spectrum employees did in fact resign, causing loss to Plaintiff's business.   Two of these employees breached their contracts with Spectrum and commenced employment with another competitor of Spectrum.   The defamatory statements, false rumors and misrepresentations created a panic among Spectrum's manufacturers, customers, employees and contractors and in the Mid-South commercial lighting

market, and caused Spectrum to lose business opportunities through various breaches of its contracts.  The Defendants actions were malicious and were a proximate cause of the various breaches of contract.

34.    Spectrum has suffered damages and financial injury by Defendants' tortious and intentional interference with its contracts with its employees, vendors, suppliers, contractors, and current and prospective customers, in an amount which will be proven at trial.  Defendants' actions have proximately caused a breach of contracts between Spectrum and its employees, vendors, suppliers, contractors, and customers.

35.    Defendants have acted intentionally, maliciously, willfully and in bad faith with intent to harm Spectrum, or with a conscious indifference to the consequences of their actions in violation of the common law and in violation of Tenn. Code Ann. § 47-50-109 and Spectrum is entitled to temporary, and permanent injunctive relief, as well as compensatory damages, treble damages and punitive damages.

**COUNT THREE**

**DEFAMATION**

36.    Spectrum re-alleges and incorporates as if fully set forth herein, the allegations of paragraphs 1 through 35.

37.    By and through their comments and communications to Spectrum's employees, former employees, vendors, customers, contractors, manufacturers and others, Defendants have defamed Spectrum thereby causing damage to Spectrum's reputation and business.

38.    Defendants published false statements about Spectrum's ability to deliver services, its owners, its employees, its business plans and intentions, and Spectrum's continued viability. Defendants published false statements and rumors and engaged in a smear campaign aimed

squarely at Spectrum in order for SESCO to penetrate the Mid-South commercial lighting market, which would likewise benefit Watt Stopper.

39.     These defamatory statements include, but are not limited to, statements that Spectrum is closing its facility, being acquired by another company (SESCO), that its owner(s) are sick, dying or retiring in 30 to 60 days, and that it will be going out of business.  The dates, times, places, participants, declarants, and interim consequences of such statements are set forth in Paragraphs 17 through 23, *supra*.

40.     Defendants knew or should have known the statements were false, or made the statements with reckless disregard for the truth of the statements, or negligently failed to ascertain the truth of the statements.  Defendants are liable for each and every publication of those false statements since the date Defendants began this defamatory smear campaign.  The publications of these defamatory statements are plenary and pervasive throughout the Mid-South commercial lighting market.

41.     These statements caused customers, employees, vendors, and others in the Mid-South commercial lighting community to question Spectrum's viability in the market and deterred some in the lighting community from associating with and/or doing business with Spectrum.

42.     Spectrum has suffered financial injury and damages to its reputation and its goodwill by these defamatory statements and actions in an amount to be proven at trial.

43.     Defendants have acted intentionally, maliciously, willfully and in bad faith with intent to harm Spectrum, or with a conscious indifference to the consequences of such actions, and Spectrum is entitled to compensatory and punitive damages.

## COUNT FOUR

## DEFAMATION BY IMPLICATION

44.     Spectrum re-alleges and incorporates as if fully set forth herein, the allegations of paragraphs 1 through 43 above.

45.     By and through their comments and communications to Spectrum's employees, former employees, vendors, customers, contractors, manufacturers and others, Defendants have defamed Spectrum thereby causing damage to Spectrum's reputation and business.

46.     Defendants published statements that may have had one meaning on their face, but, when spoken together, implied that Spectrum would be going out of business.

47.     These statements include, but are not limited to, statements that Spectrum's owner was sick, SESCO was buying Spectrum, SESCO "gets what it wants," and SESCO would be putting Spectrum out of business.  The dates, times, places, participants, declarants, and interim consequences of such statements are set forth in Paragraphs 17 through 23, *supra*.

48.     Defendants SESCO and Watt Stopper made these statements to Spectrum's employees, former employees, vendors, customers, contractors, manufacturers and others at a time in which the Defendants were seeking to gain Defendant SESCO's entry into the Mid-South lighting market.

49.     These statements implied that Spectrum was going out of business, which was patently false.  The resulting implication caused customers, employees, vendors, and others in the Mid-South commercial lighting community to question Spectrum's viability in the market and deterred some in the lighting community from associating with and/or doing business with Spectrum.

50.     Spectrum has suffered financial injury and damages to its reputation and its goodwill by these defamatory statements and actions in an amount to be proven at trial.

51.     Defendants have acted intentionally, maliciously, willfully and in bad faith with intent to harm Spectrum, or with a conscious indifference to the consequences of such actions, and Spectrum is entitled to compensatory and punitive damages.

**COUNT FIVE**

**CIVIL CONSPIRACY**

52.     Spectrum re-alleges and incorporates as if fully set forth herein, the allegations of paragraphs 1 through 51 above.

53.     In committing the acts alleged herein, Defendants SESCO and Watt Stopper, acting in concert, committed the act of civil conspiracy by (1) agreeing to act together to harm Spectrum, (2) agreeing in part together and each acting for the purpose of promoting or facilitating the commission of torts against Spectrum, and/or (3) agreeing that one or the other would engage in the acts to harm Spectrum.

54.     Defendants SESCO and Watt Stopper each had the intent to commit the acts set out in the Amended Complaint, with the goal of each Defendant benefitting from the harm by gaining Defendant SESCO's entry into the Mid-South lighting market.  Further, each Defendant knew of the other Defendant's intent to commit these acts.   The dates, times, places, participants, declarants, and interim consequences of the acts are set forth in Paragraphs 17 through 23, *supra*.

55.     Defendants SESCO and Watt Stopper, with knowledge of key facts, tacitly and/or explicitly agreed to and did participate in (1) the intentional interference in Spectrum's business relations with the predominant purpose of injuring Spectrum's business and reputation and through the improper means of defamation and/or misrepresentations; (2) the intentional interference with

contract with the predominant purpose of injuring Spectrum by breaching or terminating those contracts through the improper means of communicating defamatory statements and misrepresentations or misleading representations about Spectrum's viability; (3) the publication of false statements, whether intentionally, recklessly, or negligently, regarding Spectrum's ability to deliver services, its owners, its employees, its business plans and intentions, and Spectrum's continued viability; and (4) the publication of statements that may have had one meaning on their face, but, when spoken together, implied that Spectrum would be going out of business.

56.     Defendants SESCO and Watt Stopper did discuss or otherwise agree to the actions set forth herein and such conduct is in furtherance of a common design.

57.     Spectrum has suffered financial injury and damages as a result of Defendants SESCO and Watt Stopper's conspiracy in an amount to be proven at trial.

58.     Defendants have acted intentionally, maliciously, willfully and in bad faith with intent to harm Spectrum, or with a conscious indifference to the consequences of such actions, and Spectrum is entitled to compensatory and punitive damages.

## COUNT SIX

## BREACH OF CONTRACT AGAINST DEFENDANT WATT STOPPER

59.     Spectrum re-alleges and incorporates as if fully set forth herein, the allegations of paragraphs 1 through 58.

60.     Spectrum was contracted to Defendant Watt Stopper to be its exclusive manufacturer's representative in the Mid-South market for several years.   The relationship terminated on March 14, 2018.  As part of this relationship, Watt Stopper owed a duty to act in good faith and to deal fairly with Spectrum with respect to such exclusive representation throughout the time that Spectrum was contracted to Watt Stopper and not to favor the interests of

other manufacturer's representatives from other markets with whom it shares a national anti-competitive relationship, (such as SESCO), to the disadvantage of Spectrum.

61.    While under exclusive contract with Spectrum in the Mid-South market, Watt Stopper secretly engaged in actions to undermine that relationship by, without Spectrum's knowledge, introducing Spectrum's employees to Spectrum's competitor SESCO in order to undermine Spectrum's representation of Watt Stopper in the Mid-South, in an effort to replace Spectrum with SESCO as Watt Stopper's representative in the Mid-South market to benefit itself and SESCO and in an anti-competitive effort to run Spectrum out of business.

62.    While under exclusive contract with Spectrum in the Mid-South market, Watt Stopper actively procured the breach of Spectrum's employees' contracts with Spectrum for the benefit of itself and SESCO, in an effort to replace Spectrum as its representative in the Mid-South market and in an anti-competitive effort to run Spectrum out of business.

63.    While under exclusive contract with Spectrum in the Mid-South market, Watt Stopper conspired with SESCO to help SESCO hire away Spectrum's employees for the benefit of itself and SESCO and in an anti-competitive effort to run Spectrum out of business.

64.    While under exclusive contract with Spectrum in the Mid-South market, Watt Stopper shared Spectrum's confidential and trade secret information with SESCO, all in an effort to replace Spectrum as its representative in the Mid-South market and in an effort to run Spectrum out of business for the benefit of itself and SESCO.

65.    While under exclusive contract with Spectrum in the Mid-South market, Watt Stopper conspired with SESCO to breach its representation affiliation with Spectrum by affirmatively taking steps to convert the employees, customers, contracts and business of Spectrum

to the use and benefit of itself and SESCO and in an anti-competitive effort to run Spectrum out of business.

66. While under exclusive contract with Spectrum in the Mid-South market, Watt Stopper engaged in and conspired to engage in the unlawful conduct referenced in paragraphs 17 through 23, *supra*, all in an effort to benefit itself and SESCO and in an anti-competitive effort to run Spectrum out of business.

67. By engaging in the conduct referenced herein, Watt Stopper breached its exclusive representation contract with Spectrum in the Mid-South, causing damages to Spectrum as a proximate consequence thereof in an amount to be proven at trial.

68. After breach of the exclusive representation contract by Watt Stopper as referenced herein, Spectrum provided notice to Watt Stopper that it was resigning from its representation of Watt Stopper effective March 14, 2018. Spectrum resigned from further representation of Watt Stopper due to Watt Stopper's breach of the exclusive representation agreement for the Mid-South and in order to mitigate damages.

## COUNT SEVEN

## PRELIMINARY INJUNCTION

69. Spectrum re-alleges and incorporates as if fully set forth herein, the allegations of paragraphs 1 through 68 above.

70. As a result of Defendants' actions, Spectrum suffered and continues to suffer damages as a result of its impaired ability to provide services to its customers.

71. As a result of Defendants' actions, Spectrum has suffered and continues to suffer interference in its own ongoing projects and in its relations with its employees, manufacturers, contractors and business affiliates.

72.     As a result of Defendants' actions, Spectrum has suffered and continues to suffer damage to its reputation and good will.

73.     Unrestrained, this conduct will cause and continue to cause Spectrum irreparable injury for which there exists no adequate remedy at law.

74.     Preliminary injunctive relief is authorized for these claims pursuant to Fed. R. Civ. P. 65.   Plaintiff submits it has a likelihood of success on the merits, is subject to a threat of irreparable harm, has no adequate remedy at law, the threatened harm to Plaintiff outweighs any harm an injunction may impose on Defendants and the granting of an injunction serves the public interest.   Accordingly, Spectrum seeks preliminary injunctive relief mandating that Defendants:

   a.     Return all Spectrum property and data in their possession, if any;

   b.     Pay any proceeds acquired as a result of Defendants' wrongful use of Spectrum's property into a third-party account, either with an escrow agent or with the Court;

   c.     Pay any proceeds acquired as a result of Defendants' business dealings with Spectrum's customers and/or manufacturers under representation by Spectrum in the Mid-South into a third-party account, either with an escrow agent or with the Court;

   d.     Refrain from representing any lighting or controls manufacturer under representation by Spectrum in the Mid-South;

   e.     Refrain from disparaging and/or defaming Spectrum and its owners, employees, agents, manufacturers, contractors, or affiliates;

   f.     Refrain from contacting, contracting with and/or interfering with Spectrum's employees and existing or prospective customer or business relationships; and,

   g.     Refrain from using Spectrum's proprietary information in the possession of Defendants.

## COUNT EIGHT

## PERMANENT INJUNCTION
**(As to All Defendants)**

75.     Spectrum re-alleges and incorporates as if fully set forth herein, the allegations of paragraphs 1 through 74.

76.     Upon information and belief, there is sufficient probability that Defendants will continue to conduct themselves in a manner that is violative of the rights of Spectrum and will continue to cause injury to Spectrum.

77.     Accordingly, Spectrum seeks permanent injunctive relief upon the final adjudication of this action, converting the temporary injunctive relief sought into a permanent injunction and restraining Defendants from representing any affiliation with Spectrum, defaming or disparaging Spectrum, its owners, employees, customers, agents, manufacturers, contractors or affiliates, tortiously interfering with Spectrum's existing or prospective customer, employee, or business relationships, and from using any of Spectrum's trade secrets or proprietary information or property.

## COUNT NINE

## PUNITIVE DAMAGES
**(As to All Defendants)**

78.     Spectrum re-alleges and incorporates as if fully set forth herein, the allegations of paragraphs 1 through 77.

79.     Defendants have acted intentionally, recklessly, knowingly, maliciously and with the intent to harm Spectrum, or with conscious indifference to the consequences of their actions. Consequently, Spectrum is entitled to recover punitive damages from Defendants in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Spectrum respectfully requests the following:

a.      That this Court issue process and summons to Defendants;

b.      That this Court issue the injunctive relief set forth above;

c.      That a jury trial be conducted and Spectrum be awarded damages incurred, or to be incurred, against Defendants in an amount to be determined at trial, but in any event, in excess of $1,000,000 exclusive of interest and costs as to each Defendant on each count within the Complaint;

d.      That Spectrum be awarded punitive damages against each Defendant in an amount to be determined at trial, but in any event, in excess of $1,000,000;

e.      That Spectrum be awarded treble damages against each Defendant in an amount to be determined at trial, but in any event in excess of $3,000,000;

f.      That Spectrum be awarded its reasonable costs of litigation including attorneys' fees incurred in bringing this action;

g.      That the Court issue a writ of replevin ordering Defendants to immediately return the property of Spectrum that is in their possession;

h.      That Spectrum be awarded such other relief as is just and proper under the circumstances.

           Respectfully submitted,


           /s/JAMES M. SIMPSON
           JAMES M. SIMPSON, BPR 015023
           SHAWN R. LILLIE, BPR 014939
           JOHN R. HENSLEY, BPR 030178
           ALLEN, SUMMERS, SIMPSON, LILLIE &
           GRESHAM, PLLC
           80 Monroe Avenue, Suite 650
           Memphis, Tennessee 38103
           Telephone:  901-763-4200
           Facsimile:  901-684-168
           jsimpson@allensummers.com
           slillie@allensummers.com
           jhensley@allensummers.com

           COUNSEL FOR PLAINTIFF
           SPECTRUM LIGHTING & CONTROLS, INC.

CERTIFICATE OF SERVICE

I, James M. Simpson, hereby certify that one true and correct copy of the foregoing document was served via the Court's electronic filing service on this the 30th day of June 2018 upon:

> TAJ J. CLAYTON, ESQ.
> REBECCA LOEGERING, ESQ.
> WINSTON & STRAWN, LLP
> 2501 N. Harwood, 17th Floor
> Dallas, Texas 75201
>
> ROBERT L. CRAWFORD, ESQ.
> DIANA M. COMES, ESQ.
> BUTLER SNOW, LLP
> Crescent Center, Suite 500
> 6075 Poplar Avenue
> Memphis, Tennessee 38119
>
> ATTORNEY FOR DEFENDANT THE WATT STOPPER
>
> CHRISTOPHER M. MYATT, ESQ.
> JACOB D. STRAWN, ESQ.
> SPICER RUDSTRUM, PLLC
> 119 South Main, Suite 700
> Memphis, Tennessee 38103
>
> ATTORNEY FOR DEFENDANT SESCO LIGHTING, INC.

/s/JAMES M. SIMPSON
JAMES M. SIMPSON